IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS M. FISHER, | : | CIVIL ACTION NO. **1:CV-09-1572** |
| | : | |
| Plaintiff | : | (Judge Jones) |
| | : | |
| v. | : | (Magistrate Judge Blewitt) |
| | : | |
| MICHAEL MATTHEWS and | : | |
| SHAUN DICKMYER, | : | |
| | : | |
| | : | |
| Defendants | : | |

## REPORT AND RECOMMENDATION

### I. Background.

On August 14, 2009, Plaintiff, Thomas M. Fisher, a resident at 1842 Hoke Road, North Codorus Township, York County, Pennsylvania, filed, through counsel, the instant civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 1). Plaintiff properly filed his action in the United States District Court for the Middle District of Pennsylvania since his claims took place in the Middle District of Pennsylvania, *i.e.* York County, Pennsylvania, and Plaintiff as well as both named Defendants were located in the Middle District of Pennsylvania. Plaintiff paid the filing fee.

This Court has jurisdiction over Plaintiff's action under 28 U.S.C. §1331 and §1343. *See McNeil v. City of Easton*, 694 F. Supp. 2d 375, 382 (E.D. Pa. 2010).

Plaintiff named the following two (2) Defendants: Police Officer Michael Matthews; and Police Officer Shaun Dickmyer. Defendants Matthews and Dickmyer were employed by the Southwestern Regional Police Department.

Plaintiff avers that on August 17, 2007, Defendants Police Officers Dickmyer and Matthews violated his civil rights when they arrested him on his property. In particular, Plaintiff alleges that

Defendants arrested him without probable cause and that they used excessive force on him in violation of his Fourth Amendment rights. Plaintiff also alleges that his First Amendment free speech right was violated when Defendant Matthews retaliated against him when he called Matthews a "dirty cop" and Matthews stuck his finger in his face and told him he was under arrest. Further, Plaintiff raises a malicious prosecution claim against Defendants. (Doc. 1).

After they were served with the Summons and Plaintiff's Complaint, Defendants jointly filed an Answer to the Complaint with Affirmative Defenses on October 19, 2009. (Doc. 7). Discovery was then conducted.

On September 10, 2010, Defendants filed a Motion for Summary Judgment pursuant to Fed.R.Civ. P. 56. **(Doc. 17)**. Defendants simultaneously filed their support brief, a Statement of Material Facts ("SMF"), and an Appendix of Exhibits. (Docs. 18, 19 and 20). On September 24, 2010, Plaintiff filed his response to Defendants' SMF with Exhibits and his opposition brief. (Docs 21, 21-2 and 22).

On September 27, 2010, the Court referred Defendants' Summary Judgment Motion to the undersigned for a R&R. (Doc. 23).

Defendants filed their reply brief on October 8, 2010. (Doc. 24).

Thus, Defendants' Summary Judgment Motion is ripe for disposition. In accordance with the Court's Order, we issue this R&R.

**II. Statement of Material Facts**.

As stated, Defendants filed their SMF and Plaintiff filed his response to it (Docs. 19 and 21, respectively), as required by Local Rule 56.1, M.D. Pa. Further, as stated, Defendants and Plaintiff submitted exhibits. (Docs. 20 and 21-2). Defendants reference the record to support the facts

stated in their SMF and Plaintiff references the record to support his responses to Defendants' SMF as required by Local Rule 56. 1. *See Cyrus v. Laino*, Civil No. 08-1085, M.D. Pa.; *Cyrus v. Freynik*, Civil No. 08-2278, M.D. Pa.; *Michtavi v. Martinez*, 2009 WL 5172962 (M.D. Pa.); *Hemingway v. Ellers, 2008 WL 3540526 (M.D. Pa.); Accolla v. U.S.*, 2009 WL 3625383 (M.D. Pa.), affirmed 2010 WL 763550 (3d Cir.).

The following facts stated in Defendants' SMF (Doc. 19) are admitted by Plaintiff (Doc. 21):

1. Defendant Shaun Dickmyer is a police officer with the Southwestern Regional Police Department. (Doc. 1, ¶ 7; Doc. 7, ¶ 7)

2. Defendant Michael Matthews is a police officer with the Southwestern Regional Police Department. (Doc. 1, ¶ 7; Doc. 7, ¶ 7)

3. Officers Dickmyer and Matthews were police officers with the Southwestern Regional Police Department on August 17, 2007. (Doc. 1, ¶ 7; Doc. 7, ¶ 7)

4. It is admitted that Plaintiff resides at 1842 Hoke Road, North Codorus Township, York County, Pennsylvania.

5. It is admitted that Plaintiff had an automobile repair shop listed at 1842 Hoke Road, North Codorus Township, York County, Pennsylvania.

6. On August 17, 2007, William Lucas and Eugene Rossi, employees of Penn Line Tree Service, went to Plaintiff's property. Lucas and Rossi were trying to determine how long it would take to trim trees near electric lines and to mark it on a map for their employer Pine Line Service. Lucas and Rossi drove on a dirt lane adjacent to Plaintiff's property to look at the lines and they "probably" drove past where Adam Electric Company's ("AEC") easement went to get a side view and a better angle of another line.

3

Lucas and Rossi were not employees of AEC and they entered Plaintiff's property on August 17, 2007, without Plaintiff 's permission and without permission of AEC.

7. Michael Ward, line superintendent for AEC, testified that AEC was a co-op and that AEC had a right of way easement for the 1842 Hoke Road property owned by Plaintiff. Ward also testified:

Q. Do you believe that the Penn Line employees [Lucas and Rossi] as you're sitting here today had a right to be there pursuant to the easement or the language in the application?

A. [Mr. Ward] Yes.

Q. And why do you feel that?

A. Because of the signed membership it entitles the cooperative and states in here and agents - - under the applicant's property at all times for such purposes including without limitations such cutting and trimming of trees and shrubbery. But knowing, knowing that the situation that happened Tom's [Fishers] property earlier where he, the Asplundh crews had went in to get the adjacent trees on the other property we knew that we needed to do, to cut, you know call Tom ahead and Ned knew it. And like I said if anything had to be done with my own acres I gave the (sic) Tom the courtesy that I would call him and let him know we'd be in there.

Q. Did the two Penn Line employees know that to the best of your knowledge?

A. No.

Q. Did the officers now that before they arrested Mr. Fisher to the best of your knowledge?

A. No.

ATTORNEY BAILEY:

Objection, but you can respond. It's okay.

4

ATTORNEY DADAMO:

No they didn't know to the best of your knowledge that you were supposed to call Mr. Fisher first.

MR. WARD: No.

(Doc. 20, Ex. C, NT 71-72).

Ward also stated that AEC did not know Rossi and Lucas were going to Plaintiff's property on August 17, 2007, to look at the trees around the service line to Plaintiff's property to form a bid, and that Lucas and Rossi were not agents or employees of AEC. (Doc. 21-2, Ex. B, NT 54, 87-88).

Rossi testified at Plaintiff's October 22, 2007 preliminary hearing as follows:

Now, in terms of why you were on the property, you were there to visually inspect the work that would have been performed?

A.    [Mr. Rossi]  Well, we were bidding on work, yes.

Q.    So you were actually in the process of gathering information to make a bid to Adams Electric?

A.    That's correct.

Q.    You didn't have the job at that point, did you?

A    No.

Q.    Had either you or Mr. Lucas been to this property before?

A.    No.

Q.    Do you know if your company ever  - -

A.    I don't know if Penn Line ever had any work on that property or not. But when we do bids, we have to go out and look at the line so we can bid on them.

Q.    Did anyone from Adams  - - when you went to this property, did you have any instructions with you  - -

5

A.     No.

Q.     - - about contacting the Fishers?

A.     No.

Q.     You heard me ask the questions before to Mr. Lucas  - -

A.     Right.

Q.     - - about any agreements with Adams Electric?

A.     Right.

Q.     You didn't know anything about that?

A.     Right, we didn't know anything about that.

Q.     Okay.  You had a map with you when you got to the property?

A.     We had a map of the whole circuit that we were supposed to bid.

Q.     So you knew where the easement was, where the right-of-way was?

A.     Each pole has its own number.

Q.     And where you drove to on the Fisher property, you went  - - it would be fair to say that you drove past where the right-of-way was.  Correct?

A.     Well, there is a garage and then a house.  The line came across, so we went down the driveway where the line came across and came back out.

Q.     But you exceeded where the line was.  Correct?

A.     Well, probably.

Q.     Probably.

A.     Like I said  - -

Q.     Just listen to my question.  You went past where the easement was.  Correct?

A. As far as I know. I am not 100 percent sure of it. Like I said, we had to go down the driveway to look at the line.

(Doc. 21-2, Ex. A, pp. 28-29).

Mr. Lucas testified at Plaintiff 's October 22, 2007 preliminary hearing as follows:

Q. You were beyond the easement that Adams Electric has. Correct?

A. [Mr. Lucas] Well, whatever it is, yes.

Q. So it was beyond that?

A. The line was back there.

Q. I am not asking where the line was. Where you drove is beyond where the easement was?

A. It's possible. I wouldn't argue that point.

Q. And why did you go all the way back onto the property here to turn around?

A. To get a side view of the other line that shot up the side of his fence or his neighbor's.

Q. All right.

A. To get a better angle to look at it.

Q. Okay. Now, when Mr. Rossi was with you, who did Mr. Rossi work for?

A. Mr. Rossi, Penn Line Service, the same as I do.

Q. Okay. Did Mr. Rossi tell you anything about an agreement that Adams Electric had with the Fishers about notifying them prior to coming onto the property?

A. No.

> Q. Did it appear to you that Mr. Rossi knew about this agreement with Adams Electric that somebody would contact the Fishers before coming onto the property?
>
> A. I don't know.
>
> Q. There was no discussion of that agreement that day at all?
>
> A. Not that day.

(Doc. 21-2, Ex. A, pp. 9-10).

8. The AEC Application for Membership Plaintiff signed provided, in part, as follows:

> 7. The Applicant hereby grants unto the Cooperative an easement for the inspection, construction, operation, repair, maintenance, relocation, and removal of electric distribution lines, meters, or other facilities to serve the Applicant's premises. It is agreed that said easement shall include the right to attach, maintain, and remove communication wires and cables upon said electric poles in the event such service or services are made available by or through the Cooperative. The easement is agreed to include the right of Cooperative employees and agents to enter the Applicant's property at all times for such purposes, including, without limitation, such cutting and trimming of trees and shrubbery and/or control of their growth by reasonable means to the extent that such action is necessary to protect and keep the electric service line clear of such growth. This right-of-way easement is in addition to any other right-of-way easement which may be executed by the owner of the premises.

(Doc. 20, Ex. E, ¶ 7.).

Mr. Ward testified at his deposition as follows:

> Q. Can you explain what the, the two Penn Line employees were doing on Mr. Fisher's property that day?
>
> A. [Mr. Ward] Well, we have what we call contract work. And it's a two-year contract and we have different right of way companies come in and bid those contracts and no matter what substation it is, that depends on what district it's out of. While there was two additional bidders that they had brought in that year, which was Penn Lines and David Tree Service to look at these lines out of those substations that were coming up under contract for the next two years budget and that's what they were doing out looking at that so they could get a cost estimate to turn in.

Q.      For a two-year contract.

A.      Umhmm

Q.      After the current contract expires.

A.      Yeah.

Q.      And you didn't know that they [Lucas and Rossi] were gonna be there that day.

A.      Correct.

(Doc. 21-1, Ex. B, NT 53-54).

9.   Plaintiff testified at his deposition that the vehicle Rossi and Lucas drove on August 17, 2007, had a very small sign on the side which said PennLine Service.  (Doc. 20, Ex. A, NT 64). Plaintiff also stated that he did not become aware of the sign until after Defendant Officer Dickmyer showed up at the scene.  (Doc. 21-2, Ex. C, NT 76).  The vehicle Lucas and Rossi were in was Rossi's personal new vehicle.  (Doc. 21-1, Ex. A, NT 25).

10.-14.   Mr.  Lucas  testified at Plaintiff 's October 22, 2007 preliminary hearing that the encounter with Plaintiff occurred as follows:

Q.      Okay, Mr. Lucas.  If you could just tell the Court what happened on the date of August 17, 2007, around 1020 hours.

A.      Well, we drove in Mr. Fisher's driveway to look at the trees to see how long it would take us to trim them for Adams Co-op.

        We went down, turned around the driveway, came back out.  He [Plaintiff] came running out in front of the car with his hands out, started cursing, get the F out of the car and give me the F'ing keys.

        I just put the car in park, opened the door and got out like he [Plaintiff] said, come over. He motioned me to the side.  He shut the keys off and took the keys out the car.  We just couldn't talk to him anyhow.

Q.      Anything else happen after that?

A.      Well, we waited  - - he [Plaintiff] said he was going to call the cops. He did. We waited.  We couldn't go nowhere because the had the keys in his pocket.  We waited for you [Officer Dickmyer] until you came.

(Doc. 20, Ex. B, NT 3-4).

Mr. Lucas also testified at Plaintiff's October 22, 2007 preliminary hearing as follows:

Q.      Did Mr. Fisher say anything else to you?

A.      [Mr. Lucas] No.  I just did what he [ Plaintiff] told me, got out of the car, left it run, put it in park, put the park brake on, opened the door and got out.  I didn't do anything. I just did what he told me.

Q.      What were your feelings at that time?

A.      Well, not too good.  He [Plaintiff] cursed me, which  - - you know what I mean? We just couldn't talk to the gentleman.  That's all.  We tried to talk to him, but we couldn't.  It didn't do any good no matter what we said.

Q.      Were you afraid of your safety at that point?

ATTY. PASKEY:          Objection.  Relevance.

THE WITNESS:           Yeah.

ATTY. PASKEY:          It is not an element of the crime.

THE WITNESS:           I was scared.

(Dc. 20, Ex. B, NT 4-5).

Mr. Lucas further testified at Plaintiff's October 22, 2007 preliminary hearing as follows:

Q.      So you [Lucas] and Mr. Rossi were in the car.  You drive back onto the Fishers' property.  And when Mr. Fisher came out, which building did he exit? Was it a house or was it a shop?

A.      I don't know.  He just came out over the grass there and put his hands out in front of the car.  I don't know which building he came out of.  I didn't see that point.

Q.      When he came back towards the car and had his hands out as you indicated off to the side of your body, had you already turned the car around to go back out?

A.      Yeah, we were heading back out.

Q.      Okay.  And Mr. Fisher comes up to the car.  Did you stop the car or did you continue to drive past?

A.      I stopped it immediately.

Q.      Why did you stop it?

A.      Because he had his hands up and cursing me in front of the car (Indicating).

Q.      And it appeared that Mr. Fisher was upset at that point?

A.      I guess, yeah.

Q.      Because you were on his property.  Correct?

A.      (Nods head).

Q.      Is that a yes?

A.      Yeah, we were.  Yeah.

Q.      And it would appear that he had no idea who you were.  Correct?

A.      Correct.

Q.      So all Mr. Fisher knew is that a car with two strangers was turning back around on his property.  Correct?

A.      That's correct.   There is identification on the car, Penn Line Service.

Q.      I am talking about before he got up to the car.  You will agree with me that all he saw was a strange car with two individuals turning around on his property.  Correct?

A.      Correct.

Q.     And Mr. Fisher goes up to the car and you said he was upset.  And you indicated that he told you to get out of the car?

A.     Cursing me out of the car.

Q.     Okay.  Was he standing in front of the car or to the side of the car?

A.     Front of the car with his hands on it (Indicating).

Q.     And you got out of the car.  Correct?

A.     (Nods head).

Q.     What did Mr. Rossi do?

A.     We tried to talk to him.

Q.     Meaning did Mr. Rossi stay in the car or did he get out of the car?

A.     He was in the car, yeah.

Q.     Did Mr. Rossi stay in the car while you got out?

A.     We both got out, yeah.

Q.     Okay.  And you said when you got out of the car you put the car in park?

A.     Yeah, and put the brake on so I wouldn't run over him [Plaintiff] (Indicating).

Q.     And kept the keys in the ignition?

A.     Yeah, left it running.

Q.     Who got the keys out of the ignition?

A.     Mr. Fisher pushed me to the side and turned the key off and put the keys in his pocket.

Q.     Okay.  And after Mr. Fisher put the keys in his pocket as you testified, you indicate that he said he was going to call the police?

A.     Yeah.

Q.      So he was telling you to wait until the police got there?

A.      Well, we had to wait.  He had the keys.  Yeah.

Q.      Okay.  After Mr. Fisher as you testified put the keys in his pocket, where did he go?

A.      Over to his garage.

Q.      And after he went over t his garage, what did you and Mr. Rossi do?

A.      Mr. Rossi called Adams and his boss.

Q.      So Mr. Fisher left your immediate vicinity.  Correct?

A.      Right.

Q.      He went into a building.  Correct?

A.      (Nods head).

Q.      And you and Mr. Rossi are standing there.  Correct?

A.      (Nods head).

Q.      Is that a yes?

A.      Yeah, standing there or sat back in the car.

Q.      You were able to move to sit back in the car. Correct?

A.      Correct.

Q.      And if you wanted to, both you and Mr. Rossi could have walked off that property without the car and Mr. Fisher would have never seen you.  Correct?

A.      We could have walked off, yeah.

Q.      Mr. Fisher did not physically restrain you at any time, did he?  He didn't place his hands upon you and restrain you?

A.      Just to get the keys to the car.

Q.      You said he pushed you out of the way.  Correct?

A.      Correct.

Q.      I am talking about when he went back into this building, he wasn't physically restraining you.  Correct?

A.      No, not then.

Q.      And he wasn't physically restraining Mr. Rossi.  Correct?

A.      Correct.

Q.      And Mr. Rossi could have  - - while Mr. Fisher was in that building, could have walked off the property.  Correct?

A.      Correct.  We could have walked off.

Q.      You both could have walked off the property.  Correct?

A.      Yeah.

Q.      And what was restrained was your vehicle.  Correct?

A.      Correct.  Yes.

(Doc. 21-2, Ex. A, NT 11-15).

At his deposition, Plaintiff testified as follows about the incident with Lucas and Rossi:

Q.      . . .  There were two gentlemen in the vehicle correct?

A.      Yes

Q.      Okay did they get out of the vehicle at that point?

A.      Yes

Q.      Did you then reach into the vehicle and take the keys out of the ignition?

A.      No

Q.      Tell me what you did then?

A.      Well

Q.      After they got out.

A.      Okay after they got out.  After they got out I said to them what are you guys doing back there.  And they said we're here with Adams Electric to trim the trees.  I said let me see your Adams Electric identification.  They had none.

Q.      Okay.

A.      This is a time when there's a bunch of robberies going on in the neighborhood.  The police have been putting it in the paper if you see any suspicious activity call the police.  They had no identification.  They had a sticker on the side of the vehicle that would, you could've probably went to the what do you call it, the mall, and bought for three bucks or something.

Q.      That's the sticker identifying the company.

A.      Well, yeah it was on the back of the vehicle.

Q.      Okay back or side or was there more than one?

A.      No I'm more.  I'm not even sure where it was on the vehicle.

Q.      Okay

A.      Yeah

Q.      That's fine.

A.      But like I said I, these guys the big guy and I have no idea which one he was.  He was the passenger in the vehicle started to get verbally abusive with me. I did.  I was.  He was on my property.  The guy that was driving and again I don't know who, what his name was, but it was the man that was driving I said to him give me the keys.  I said you guys are trespassing, I'm gonna call the police and have youn's arrested for trespassing.  He gave me the keys to the vehicle.

Q.      He being the driver.

A.      Would've been the driver.  Would've been the smaller of the two men.  Again, I don't know which is which.

15

Q.     So had the smaller guy taken the keys with him when he got out of the vehicle?

A.     No he got out.  He gave 'em.  He got in the vehicle and gave me the keys.

Q.     Was the vehicle still running prior to that time?

A.     I honestly can't answer that.

Q.     Were the keys still in the ignition prior to that time?

A.     Yes.

Q.     Okay did you in any way push either of these gentlemen or make any physical contact with them?

A.     Never touched them.

Q.     Why did you want the keys?

A.     I didn't want 'em driving off.  There's too many unanswered questions.

Q.     Okay so was it your intent to keep them on the property until you could get the police to come there?

A.     My intention was to clarify who they were and why they were on my property.

Q.     Okay but in taking the keys was it your intent to keep them on the property until the police go there to respond to these questions or inquiries?

A.     No.

        ATTORNEY BAILEY:

Objection objection please, objection asked and answered.  You may respond again.

        ATTORNEY LAVERY:

Go ahead.

MR. FISHER: I had no intentions of keeping the gentlemen on the property. I wanted the vehicle. The two gentlemen could've walked off the property at any given time. I never restrained the two individuals.

Q.      So it wasn't your intention in taking the keys to keep the two individuals there, you just wanted to keep the vehicle there.

ATTORNEY BAILEY: Objection, asked . . .

ATTORNEY LAVERY: Is that what . . .

ATTORNEY BAILEY:

Objection, asked and answered. You may respond again.

ATTORNEY LAVERY:

Let me just get the question out Don so it's on the record?

ATTORNEY BAILEY: I think well, all right go ahead Frank. It was out, but go on. It's all right. It's all right.

MR. FISHER: I wanted the vehicle on my property.

ATTORNEY LAVERY:

Okay, did you tell the two gentlemen that they could leave, but you wanted the vehicle there?

MR. FISHER: No I told 'em I was gonna cal the police and have 'em arrested for trespassing.

Q.      Did either of the two individuals attempt to explain to you why they were on the property?

A.      It's possible they could have, but again, the larger gentleman, the passenger, he was becoming verbally abusive with me and I wasn't really interested in standing there and trying to reason with two men that I had no reason, no explanation from them why they ere on my property that they could verify.

Q.      Hadn't they at that point before explained to you that they were there about trimming the trees?

17

A.     Yes.

(Doc. 21-2, Ex. C, NT 77-83).

Regarding whether Lucas and Rossi could leave Plaintiff's property, Lucas testified at Plaintiff's October 22, 2007 preliminary hearing as follows:

Q.     If you [Lucas] thought your liberty and your freedom was restrained because Mr. Fisher took you keys, why didn't you ask Mr. Rossi for the phone to call the police if you thought you were being held captive?

A.     He called the police.  I just  - -

Q.     Who called the police?

A.     Mr. Fisher.

Q.     If you felt that you weren't free to leave and you were being held  - -

A.     I didn't want to leave.  I just wanted to straighten out the problem.

Q.     You didn't want to leave?

A.     Right.

Q.     But you realize you could have left if you wanted?

A.     Yeah.

Q.     And you agree with me that you didn't call the police, did you?

A.     I didn't call the police.

Q.     And Mr. Rossi didn't call the police?

A.     No.

Q.     And did you ask the police to file charges against Mr. Fisher?

A.     Did I?  No.

Q.     Did you hear Mr. Rossi ask the police to file charges against Mr. Fisher?

18

A.    No.

Q.    You were just told the charges were going to be filed.  Correct?

A.    (Nods head).

Q.    Is that a yes?

A.    Yes.

(Doc. 21-2, Ex. A, NT 17-19).

15.    As quoted above, Mr. Lucas testified at Plaintiff's October 22, 2007 preliminary hearing that he "was scared" after Plaintiff pushed him to the side, turn the car off and  took the keys and put them in his pocket.  (Doc. 20, Ex. B, NT 4-5 and Doc. 21-2, Ex. A, NT 13).


16.    Plaintiff testified at his deposition as to why he took the keys to the car Lucas and Rossi were in as follows:

Q.    Why did you want the keys?

A.    I don't want them driving off.  There was too many unanswered questions.

Q.    So was it your intent to keep them on the property until you could get the police to come there?

A.    My  - - my intentions was to clarify who they were and why they were on my property.

Q.    Okay.  But in taking the keys, was it your intent to keep them on the property until the police got there to respond to these questions or inquiries?

        MR. BAILEY:   Objection.

A.    No.  The  - -

        MR. BAILEY: Objection.  Objection, please.  Objection.  Asked and answered.  You may respond again.

BY MR. LAVERY:

Q.  Go ahead.

A.  I had no intentions of keeping the gentlemen on the property.  I wanted the vehicle.

(Doc. 20, Ex. A, NT 67).

17. Lucas and/or Rossi explained to Plaintiff that they were on the property on behalf of Adams Electric Cooperative. (Exhibit A, 65:8-9)

18. Mike Ward is and was the Line Superintendent for Adams Electric Cooperative.

(Exhibit C, 10:7-8)

19. -20.  Mr. Ward  testified at his deposition as to what happened when he went to

Plaintiff's property as follows:

A.  I had gotten a call from our dispatcher and I was in the southern end of York County that there was, there was some guys that was bidding the right of way contract had, was on the property and Mr. Fisher had taken his keys, if I could go down and see what was going on.

Q.  Okay and did you proceed up to Tom Fisher's place?

A.  Yes yep.

Q.  Now in your own words as best you can recollect, I'm gonna try and not to interrupt you with any questions, okay just from when you arrived until you left could you share with us what you remember seeing?

A.  Well when I first pulled up I had noticed the pick-up truck with the, the two employees from the Penn Lines Tree Service that was down in the right of way.  And so Id rove down there first and asked the guys what was going on and they aid that Tom had come out and he was upset and had taken their keys.  And I think they mentioned that he was gonna go call the police officers.  And I said I know Tom.  I said let me go up and talk to him and see what's going on.  So I drove back up the lane and back around to in front of

20

his garage. And I probably parked I don't know maybe thirty, forty feet away from the two bay garage. And I had walked in the garage and saw Tom and I said hey Tom what's goin on. And then as soon as Tom started speaking I could tell he was, he was upset and about the guys being down there in the right of way. And he said well the police are on their way, they were trespassing and we'll wait to they got there. So we waited till they got there. They got there maybe five minutes later and when they showed up they, well I introduced myself. And they asked me to step outside and go back to the vehicle.

Q.    To your vehicle.

A.    Umhmm

Q.    Okay

(Doc. 20, Ex. C, NT 22-24).

21. Officer Dickmyer initially spoke with Plaintiff when he arrived on the scene and Plaintiff was visibly upset and he was yelling. (Exhibit F - Dickmyer deposition, 13:7-8)

22. Officer Dickmyer noticed a rifle close to Plaintiff when they were speaking. (Exhibit F, 13:11-13)

23. Officer Dickmyer then went to the PennLine employees, Lucas and Rossi who were sitting in their vehicle, to make contact with them about the situation. (Exhibit F, 13:17-21)

Also, with respect to Plaintiff's rifle, Plaintiff testified as follows:

Q.    There's an indication in the police report that there was a rifle in the shop at that point.

A.    Yes

Q.    Was there?

A.    Yes

Q.    Okay and was it loaded?

A.      No, the clip was in the locked cash drawer.  I would never leave a loaded rifle sit around the shop.

Q.      Okay what kind of rifle was it?

A.      A .22

Q.      Did you have any discussion with Officer Dickmyer about the rifle?

A.      He's, he never brought it up.

Q.      Okay.

A.      Twice he [Officer Dickmyer] was standing within twenty feet of that gun and if he felt uncomfortable with the gun he could've asked me to lock it away or he could've put it in his cruiser.

(Doc. 21-2, NT 93-94).

24.-27.   Defendant Officer Dickmyer testified at his deposition as to what happened when he  arrived at Plaintiff's property as follows:

A.      I arrived on scene, Mr. Fisher was the Complainant, I walked over to Mr. Fisher to investigate the situation; at that point I knew Mr. Fisher was upset by his demeanor and actions, he was, he was yelling and he was concerned about the two, two Pennline employees that were on his property.  And, at that point, I also noticed a rifle next to him in the garage.  On speaking with him, I was, I was a bit concerned because Mr. Fisher was upset so I decided, Mr. Fisher told me about the situation and I wanted to go make contact with the actual Pennline employees that were on the property made, I walked over, made contact with them, they were still in their vehicle, I knew at that point that Mr. Fisher had the keys. They appeared to be very upset and, and nervous and the driver at least appeared to me to be very scared.  They had explained to me that Mr. Fisher, I asked again, they were down on the property at the right-of-way and I asked them what had happened, and they said Mr. Fisher jumped out in front of us, waving his harms, forcing them to stop the vehicle.  The driver attempted to get out of the vehicle to see what the issue was, and from what was told to me that Mr. Fisher pushed him aside and grabbed the keys out of the ignition.  And, I'd be speaking to them further and then walked back over to Fisher to get some more information.  I spoke to Mr. Fisher to try to compromise,

to get some compromise, if they could work out the issues, so I had the two gentlemen, they were on the truck, come over, and to see if Mr. Fisher and the two gentlemen can sort out their differences.[1]

Q.      Their ride, was it a truck?

A.      It was a truck.

Q.      Pickup truck?

A.      Yes.

Q.      When, when did Ward come?

A.      Ward came to the scene after Mr. Fisher was taken into custody.

Q.      The two gentlemen that were in the truck, was it, was the truck, describe it for us, did it have any insignia on nit or anything like that?

A.      From what I can recall, I believe it had the, the Pennline logo on the truck.  Don't know if it was on the door or on a, on the side of the truck.

Q.      What is, what is Pennline, what do you mean, Pennline. Now you're a cooperative down there as Adams Electric, right?

A.      Right.

Q.      Okay.  What is Pennline, is it a transmission company or something, what is it?

A.      Pennline is a separate subcontracting firm to Adams Electric.

---

[1]We have used the correct spelling of Plaintiff's last name in all of the quotes from Defendant Dickmyer's testimony.

Q.      Okay. You say this, this truck was marked and it had an insignia on it, as best you can recollect?

A.      That I can remember, yes.

Q.      Do you remember what color it was, the vehicle?

A.      I, I don't, I believe it may have been red, but that's as much as I can remember.

Q.      Okay, how are the guys dressed?

A.      I don't I don't recall . . .

Q.      Did they have work clothes on, or like, like a khaki uniform type of thing . . .

A.      Yes.

Q.      . . . work uniform, okay.  Boots?

A.      I don't recall what, what footwear.

Q.      Hard hats?

A.      No.

Q.      Did they represent to you that they worked for Adams Electric?

A.      They had stated to me that they were on a bid with, with Adams Electric.

Q.      Did they, and I asked Michael [Ward] some of these same questions.  Did they indicate to you that they were there with the authority or knowledge, rather, perhaps, the knowledge of Adams Electric?

A.      Yes.

Q.      They expressly indicated that to you?

A.      They stated, they stated that they were down there for Adams Electric to c heck on the right-of-way with the trees.

Q.      To do a bid.

A.      Right.

(Doc. 20, Ex. F, NT 13-17).

Further, Mr. Rossi testified at Plaintiff's preliminary hearing as follows:

Q.      When you and Mr. Lucas first arrived on the property, did you notify anyone on t he Fisher property that you were there?

A.      No.  No.

Q.      Did you tell anybody why you were there?

A.      No.

Q.      Did you know, Mr. Rossi, whether the trees that you were looking at to bid the job, do you know whether they were o Mr. Fisher's property or not?

A.      Some of them were, yes.

Q.      But some of them weren't?

A.      I didn't know if it was Mr. Fisher's property, if that's what you are asking me.

Q.      Did you know it was Mr. Fisher's property?

A.      No.  We look at 990 miles of line.  I can't  - -

(Doc. 21-2, Ex. A, NT 30-31).

28. -29.  Defendant Officer Dickmyer testified at his deposition that he tried to resolve the situation:

Q.      Okay.  You went back up and talked to Mr. Fisher.  Did Mr. Fisher and all of this by the way is prior to when Michael [Ward] arrives, right?

A.      Yes.

Q.      What, did Mr. Fisher indicate that he had a, he wanted the people arrested or that he wanted you to do something, or what did he, what did he pose as a solution or what did he respond to you with, what occurred during that conversation?

A.      He wanted the people charged for trespassing on his, on his land.

Q.      Okay.  Did you decline?

A.      I didn't have all the information on hand and at that pont I was still investigating it.

Q.      Okay.  What happened next?

A.      After I, afer learning, you know, why the Pennline workers were there on his property, I then tried to resolve the situation and tried to get the keys back for the employees; we spoke actually behind his garage, looking toward where the vehicle would be sitting.  We spoke about the situation, Mr. Fisher didn't, didn't want to reason at all with the employees and wouldn't give the keys back and, and it continued to be, he acted very hostile with the employees and yelling profanities at the employees.

Q.      Do, did you call Mr. Ward?

A.      Not at that time.

Q.      Did you ever call Mr. Ward?

A.      I didn't call Mr. Ward, but I do know that the two employees had called their, Mr. Ward from Adams Electric to come down and see me.

Q.      Do you know whether Mr. Fisher called Mr. Ward?

A.      I don't recall that.

Q.      Do you remember when Mr. Ward arrived?

A.      Mr. Ward arrived after we, after Mr. Fisher was inside my cruiser.

Q.      Are you sure about that?

A.      Mr. Ward, from what I can remember, arrived down I believe after Mr. Fisher was placed into custody, from what I can remember.

(Doc. 20, Ex. F, NT 19-21).

After the police arrived on the scene and asked Mr. Ward to go back to his vehicle, Ward testified at his deposition as to what happened next:

A.      So I went back out and leaned up against the front of the company jeep.

Q.      What happened next?

A.      Well, I was looking in and if I remember correctly the first bay I think Tom has a phone and a desk or something over there and the police officers had went in and I, their backs are to me.

Q.      Right.

A.      And I can see a little bit of Tom. I really can't hear a whole lot what's going on. I could, I could hear some swearing. And I might've went on out you know look back and you think it's an eternity. I don't know how long it went on, maybe a minute or two they were talking back and forth. And I saw the, I saw the officers take Tom down and handcuff him.

Q.      All right let me ask you some at this juncture, let me ask you some individual questions?

A.      Okay.

Q.      Based upon what you observed did you see Tom swing at the officers, come at them; assault them or anything like that?

A.      I couldn't see anything because their backs was to me. And all and I was watching. And I, no I really couldn't see anything cause Tom was in front of them and their backs were to me.

Q.      Right.

A.      So if they were you know here and Tom's here I couldn't see.

Q.      Did you hear them say anything to Tom about his being under arrest?

A.    I didn't really hear much of anything.

Q.    Okay Michael do you have a recollection of and I, you may not have been able to see I understand that their backs were to you, but did you appreciate the fact that you didn't hear much of anything?  Did you hear any of them order Tom to turn around or to put his hands behind his back or I know you already answered you didn't hear 'em tell him he was under arrest, but did you hear anything like that, that you can remember?

A.    No cause I'm probably like fifty feet, forty to fifty feet away.

Q.    Okay before the officers to use your words, took Tom down did you see any fisty-cuffs, fighting, any weapons drawn or anything like that?

A.    No.

Q.    Okay is it fair to say that you didn't know which officer was which?

A.    Correct yeah.

Q.    In fact you don't even know if it was these two officers right?  You didn't know who they were, is that correct?

A.    No.

Q.    Now you did indicate, I believe, just a few minutes ago that you heard some swearing.

A.    Umhmm

Q.    Do you know whether that was the officers?  Do you know whether it was Tom?  Do you now whether it was both?  Think back on that?  What do you remember about the swearing?

A.    I don't know where it was.  I don't know who was saying it.

Q.    Okay do you remember what was said?

A.    I heard the F word a couple times.  That was about it.

Q.    Okay now I wanna ask just a couple questions bout their location okay.  Based upon your recollection, I'm referring to all three of the

gentlemen now, Mr. Fisher and Mr. Dickmyer and Mr. Matthews, all three of those gentlemen were they inside, inside the building inside the bay? Were they at the bay or close to it entrance to the bay or were they outside of a little bit?  Try to think back and tell us if you remember?

A.     They were inside, inside the bay more than halfway, maybe little over halfway, halfway to two-thirds of the way.

Q.     All right now I'm gonna change direction just a little bit.  Did you see the police officers arrive?

A.     Yes.

Q.     Did they arrive together?

A.     No.

Q.     How long had the officer who arrived first been there when the second officer came?

A.     A couple minutes maybe, several minutes.

Q.     When the officer who came first arrived how, if you remember, did he drive up?   How did he come in?  How did he come in there?  Did he speed up? Did he come up fast?  Did he come up slow, normally?

A.     Yeah it was average.  I mean normal.

Q.     Okay and I'm assuming that he after he got up there wherever he stopped his police vehicle he got out is that correct?

A.     Umhmm

Q.     Did he talk to the two gentlemen from the right of way first or did he talk to Tom first or to you first or greet the friendly local dog?  What did he do?

A.     I don't recall of him talking to the two Penn Line employees. I think he just came right up and was talking.  Came to the garage I think and was talking to Tom.

Q.     Okay now, how did they appear to be conversing, just two people talking?  Did you hear anything, overhear anything?

A.     No cause at that time I had, he had asked me to step out.  He had stepped me you know cause he came in first and he had asked me to step back over to the vehicle.

Q.     Okay and did there appear to be thing, anything unusual or of a contentious you know difficult nature between Tom and that officer before the second officer came?

A.     I don't.  I can't honestly say if there , if there was.  I know.  I know like I said I know Tom was, was upset.  I know the officer came in and I was back out at the vehicle.  And I don't know, I don't know what was like I said I couldn't hear. I don't know what was going on.

Q.     Again based on your recollection when the second officer arrived do you have a recollection of how he drove into the into Tom's place?

A.     I think he just came in. Cause they, they were both parked in behind me. I think he just came in.  It was nothing out of the ordinary I don't recall. I mean cause as far as spinning tires and stuff I think he just came in normally.

Q.     Okay do you have a recollection of how he, what he did when he exited the vehicle, police vehicle?

A.     No I don't.

Q.     Did he walk directly to where the other officer and Tom were?

A.     Yes.

(Doc. 21-2, Ex. B, NT 25-31).

30.-33.  Defendant Officer Dickmyer testified at his deposition that he did not intend on arresting anybody and that he called Officer Mathews for assistance:

Q.     . . . anything else that happened though that you can recollect before Michael Matthews arrived?

A.     [Defendant Dickmyer] Just that I was trying to resolve the situation.  I responded to the scene, not, you know, my whole attempt was to not arrest anybody at the scene, I wanted to resolve it, I noticed that I couldn't get the situation under control and that's when I called for Officer Matthews down.

Q.     Now, what did you say when you asked for Officer Matthews, simply that you needed support or needed help or what, did you give any reasons?

A.     I, I just remember radioing Officer Matthews if he could respond down for assistance.

Q.     And he did?

A.     Yes.

Q.     Do you remember anything, he arrived at the scene, was he by himself, I think obviously he was, is that correct?

A.     Yes.

Q.     Okay.  What occurred?

A.     He [Officer Matthews] had arrived down in the parking lot there in front of the building and then myself and Officer Mathews attempted to speak and reason with Mr. Fisher again, about the keys and the whole issue.

Q.     And Mr. Fisher was not reasonable?

A.     No.

Q.     Well, what did he do, what did he say, how did he act?

A.     Mr. Fisher was acting very hostile, he was, he was yelling profanities and we continued to try and reason with him and talk to him about the situation and he wasn't having any of that, he would just continue to yell and curse.

(Doc. 20, Ex. F, NT 23-24).

Further, Defendant Officer Dickmyer testified at his deposition:

A.     I was trying to get the keys back.  I was telling Mr. Fisher and as well informing him, you know, to please give the keys back to the employees.

Q.     Did you order him to give you the keys?

A.      I don't recall, I don't, I don't think I ordered him to give me the keys, but I was trying to get, I was trying to reason with him the best I could.

Q.      Okay.

A.      I was trying to respect Mr. Fisher the best I could.

Q.      Okay.  Did you and Mr. Matthews decide anything, reach any final conclusions before you went to talk with Mr. Fisher?

A.      The . . .

Q.      Let me rephrase that.  Shaun, did you and Mr. Matthews decide what you were going to do when you decided to go to talk to Mr. Fisher again, or approach him again?

A.      Well, we decided that, you know, false imprisonment charge could be brought but that wasn't our intentions at first, we wanted to reason with Mr. Fisher again, cause my intention was, I did not want to have to arrest him.

Q.      All right.  And, so, what was Mr. Fisher doing when you and Mr. Blake, or Mr. Matthews, I'm sorry, I'm claiming Matthew Blake again, forgive me.  When yo and Mr. Matthews were, were talking, what was Mr. Fisher doing?

A.      He was walking around his garage, pacing back and forth.

(*Id.*, NT 31-32).

Additionally, at Plaintiff's preliminary hearing, Defendant Officer Dickmyer stated:

On the date and time in question, I was called down to the residence through York County Control that Mr. Fisher (indicating) had a complaint about two gentlemen on his property from the electric company.

When I met with Mr. Fisher, he was very upset.  He was yelling some profanities.  He was upset about the situation with the electric company employees coming onto his property.

I then spoke to William Lucas and Eugene Rossi after I spoke with Mr. Fisher.  They said they  - -

32

ATTY. PASKEY:          Objection.  Hearsay.  They have already testified, your Honor.

THE COURT:          Sustained.  Go ahead.

THE WITNESS:          Okay.  I am going over my notes here.

ATTY. PASKEY:          Take your time, officer.  No rush.

THE WITNESS:          Okay.  I then tried to get both parties to talk the situation out.  Mr. Fisher was still yelling profanities. I then decided to wait for a backup officer to speak with Mr. Fisher.

When my backup officer arrived, we made contact with Fisher to try to get the keys back and to resolve the situation.  Fisher was acting very combative and yelling profanities at my partner as well as myself.

We then asked Mr. Fisher to give the car keys back.  He reached into his pocket to pull out the keys and then he put them back in his pocket.

Fisher continued to argue and yell profanities.

ATTY. PASKEY:          I am going to object to relevance at this point, Your Honor.  He is not being charged with disorderly conduct.  Profanities at this point are irrelevant.

THE COURT:          He is charged with resisting arrest.  I think profanities sometimes is an element of how a person's demeanor is at the time of the arrest.

ATTY. PASKEY:          I would agree if we got to the point of the arrest, but we are not even at that yet.

THE COURT:          Then I will sustain your objection.

THE WITNESS:          I then told Fisher that he was under arrest.  I then attempted to get control of Mr. Fisher.  When I grabbed Mr. Fisher, I grabbed Mr. Fisher's arm and he then pushed off of myself as well as the other officer and we both lost our grip.

Fisher then tensed up like he was going to strike us with his fists clenched and looking towards us.  I displayed my pepper spray as well as the other officer, and he then complied.  Fisher was then taken to the ground and handcuffed

33

to the rear.  When I did take Mr. Fisher to the ground, he did resist quite a bit there as well.  He was finally taken into custody with no further incident.

(Doc. 21-2, Ex. A, NT 32-34).

Defendant Officer Dickmyer stated at Plaintiff's preliminary hearing that Plaintiff began using profanities after Defendant Officer Mathews arrived:

A.     We got the car keys after Mr. Fisher was arrested.

Q.     Okay.  Did anyone tell Mr. Fisher at ay point, hold on to the car keys until we figure this out?

A.     No.

Q.     You didn't hear that?

A.     No.

Q.     Okay.  Did Mr. Fisher offer to give the car keys back at any point?

A.     No.

Q.     You said Mr. Fisher was very agitated when you were talking with him to the extent that he was using profanities.  Correct?

A.     Yes.

Q.     Was he using profanities towards you?

A.     No.

Q.     Was he using profanities towards Officer Matthews?

A.     Yes.

Q.     That was after Officer Matthews got there.  Correct?

A.     Yes.

Q.      So when yo first testified about the profanities, he wasn't mad at you, was he, at first?

A.      At first, no.

Q.      Okay.  But when it became apparent that the police were not going to either issue a citation or charge Mr. Lucas or Mr. Rossi with trespassing, Mr. Fisher would have gotten agitated with both you and Officer Matthews.  Correct?

A.      Yes.

Q.      He wanted them charged.  Right?

A.      I am sorry?

Q.      He wanted them charged with trespassing.  Correct?

A.      Yes.

Q.      Because he called County Control.  Correct?

A.      Yes.

Q.      And when you got to the scene, he told you that he wanted them charged with trespassing?

A.      Yes.

Q.      And you refused.  Correct?

A.      I told him no.

Q.      Why?

A.      Because of the situation that was going on.  We were trying to get more information at first.

Q.      Okay.  Why would you tell him no when they were trespassing on his property?  But then you were going to take him into custody for false imprisoning two people who sat alone in a car for 20 minutes?

A.     When we first go there, I was trying to get the correct information as to what the incident was.

Q.     Okay.  When you got the information as you saw it about the incident, you still refused to charge them with trespassing.  Correct?

A.     I don't recall that I refused to charge anybody at that time.

Q.     They haven't been charged with trespassing.  Correct?

A.     No, they haven't.

Q.     Now, you then indicated that you told Mr. Fisher he was under arrest?

A.     Yes.

Q.     Did you verbally tell him?

A.     Yes.

Q.     Okay.  What did Officer Matthews do?

A.     Officer Matthews then assisted me.   I don't remember what he said.

(Doc. 21-2, Ex. A, NT 39-41).

Plaintiff testified at his deposition that he tried to return the keys:

A.     [Plaintiff] And Officer he basically says he says well what do you want me to do.  I said I want 'em arrested for trespassing I said it's gotta, this gotta come to a stop.

Q.     Okay what happens then?

A.     I then said to Officer Dickmyer said to me he says well, he says I don't really can't say I can justify arresting them for trespassing?

Q.     Did he tell you why?

A.     No he did not offer an explanation.

Q.     At that point did you make Officer Dickmyer aware or did he make you aware that he knew that you had their keys?

A.      Oh he knew I had their keys.  When he, when he showed up I let, he knew I had their keys.

Q.      Okay all right so Dickmyer says something along the lines that he couldn't justify arresting them for trespassing.  What happens then?

A.      That's when I reached in my pocket, got the keys, gave them to Officer Dickmyer.  I said if you ain't gonna do anything you and those guys might as well get the fuck out of here.

Q.      Okay so you actually took the keys out and handed them to Officer Dickmyer.

A.      Yes.

Q.      And what did he do?

A.      He says just hold onto them until we get straightened out.

Q.      Okay had you actually handed the keys to him?

A.      I attempted to hand the keys to Officer Dickmyer.

Q.      Okay.

A.      He did not take 'em.

Q.      And when you say attempted can you explain that to me?

A.      Well I took 'em out and I said to him, that's when I said to him if you ain't gonna do anything yo and those guys might as well get out off my property.

Q.      Okay and Officer Dickmyer says you to hold onto the keys.

A.      He said just hold onto 'em till we get this straightened out.

Q.      Okay now was anybody else there at that point other than you and Officer Dickmyer?

A.      No.

(Doc. 21-2, Ex. C, NT 91-93).

34.-42., 44.-46.   Defendant Officer Dickmyer testified at his deposition what happened

after he started to talk with Plaintiff:

> BAILEY:        Describe if you can, please, in as much detail, what happened
> after you started talking with Mr. Fisher?
>
> SHAUN DICKMYER:
>
> We had, we tried to reason with Mr. Fisher to give, to give the keys
> back, and Mr. Fisher started to yell and say profanities and continue to act
> out of control.  And I was concerned about the situation, I didn't, I was, I
> didn't know Mr. Fisher very well, I didn't know what he was capable of,
> I was concerned that this, this situation might escalate and he continued to
> yell and he didn't want to reason with us whatsoever.  That's when I decided
> that I verbally told Mr. Fisher that he's under arrest, and I went to grab his, his
> arm to get control of him and Officer Matthews then went on the right side to
> gain control and that's when Mr. Fisher tensed up and, and he pushed off
> of us.  Myself and Officer Matthews then attempted to get control of him
> again, Mr. Fisher had tensed his arms up, like, you know, fighting stance,
> and I was concerned that he was going to try to strike one of us.  So that's
> when we both, we had to get out our pepper spray, and we didn't spray
> him, but we ordered him to the ground with it, and as Mr. Fisher was
> going to the ground I then grabbed Mr. Fisher's arm to get control of him, to
> place him on the ground and reason for going on the ground was to get, to gain
> control of Mr. Fisher.  When he was on the ground, he was still tense and
> upon cuffing, he was still tensed up.  And Mr. Fisher was then placed in
> handcuffs to the rear.

(Doc. 20, Ex. F, NT 34-35).

Defendant Officer Dickmyer testified at his deposition that Plaintiff managed to get free:

> Q.        . . . he [Plaintiff] manages to disengage from both you and Mr. Matthews, he
> manages to get free of you, is that correct?
>
> A.        Yes.
>
> Q.        Okay.  And what did he do after he got free of you?
>
> A.        That's when he [Plaintiff] had tensed up in a fighting stance, with his fists clenched.

Q.    Had his fists clenched.

A.    Yes.

Q.    He was facing you?

A.    He was facing both of us; we were in front of him.

Q.    Okay.  Do you remember what he said?

A.    I . . .

Q.    I can be more specific: did he threaten you?

A.    I, no.

Q.    Okay.  Did he raise his fists, assuming a posture to strike you?

A.    He had, he had kept his fists down at his side, no but he did not raise his fists.

Q.    Okay.  Did, I assume he had a few choice words for you, do you remember what he said?

A.    I don't recall what he said.

Q.    Okay, what happened next?

A.    That's when I was concerned that something else may occur as far as either Mr. Fisher striking myself or Officer Matthews, that's why I, I had engaged, had gotten out my pepper spray, as well as Officer Matthews. That's when we ordered him to the ground.

Q.    And, Shaun, what did he do when you ordered him to the ground?

A.    He started going down to the ground and I walked over to gain control of Mr. Fisher as he was going down to the ground; I grabbed his arm and then he was placed on the ground, he wasn't thrown on the ground, he was placed.

Q.    Why didn't you just let him get on the ground?

A.     Because I wanted to get, gain control of him.  Mr. Fisher could have went on the ground and popped back up.

Q.     Okay.  So you moved over to him and, and made contact with him at some point, you didn't throw him to the ground or forcibly overdo it, you, you made sure you controlled him, he got on the ground.

A.     Yes.

Q.     What did Mr. Matthews do?

A.     Mr. Mathews assisted in handcuffing Mr. Fisher.

Q.     Okay.

A.     He gained control of his other arm.

Q.     Did you give Mr. Fisher instructions at that point?

A.     We had stated, place your hands behind your back.

Q.     Okay.  Did he listen to what you told him?

A.     The hands went behind the back, but he was still tensing, and it was very, it was difficult to get the handcuffs on him at first.

Q.     Okay.  He was tense then.  Ever been arrested?

A.     No.

Q.     All right. Did you give him instructions after you had him, after you got him handcuffed?

A.     We had, we had helped him up and then placed him inside the car and that's when Officer Matthews, after we had helped him up, that's when we, Officer Matthews had taken the car keys out of Mr. Fisher's shirt pocket.

Q.     Okay.  How did you know they were in his shirt pocket?

A.     Because when we were trying to reason with Mr. Fisher, he had taken the keys out and dangled them and then stuck them back n his pocket.

40

(*Id.*, NT 43-47).

At Plaintiff's preliminary hearing, Defendant Officer Dickmyer testified as to Plaintiff's arrest:

Q.   Did he [Plaintiff] verbally or orally threaten Officer Matthews before you put him in an arm bar and tried to take him to the ground?

A.   Yes.

Q.   What did he say?

A.   I don't recall.

Q.   Threatened him how?

A.   He [Plaintiff] was pointing at Officer Matthews yelling profanities.

Q.   Did he [Plaintiff] threaten him [Matthews] with violence or make a move towards Officer Matthews before you put him in an arm bar and tried to take him to the ground?

A.   No.  No.

Q.   Okay.  So you said you tried to take him  - - you attempted to get him under control, which you clarified that as you grabbed his arm in an arm bar and tried to take him to the ground.

A.   Yes.

Q.   And was he questioning why he was being placed under arrest at that point?

A.   No.

Q.   Okay.  Then I believe your testimony was he then pushed off and had a fist clenched?

A.   He pushed off of us and then he clenched his fists like he was going to strike one of us.

Q.   Did he pick his fist up to attempt to strike anybody?

A.   No, no.  He clenched his fists in a fighting stance.

Q.     He was tense at that point (Indicating)?

A.     Yes.

Q.     And then you testified that he complied?

A.     Afer we  - - once we got him down to the ground.

Q.     That's not how you testified on direct.  You testified he pushed off, his fists clenched, you talked about the pepper spraying, then he complied.

A.     Yes.

Q.     And then you took him to the ground.  What do you mean by he complied?

A.     He complied after we got his hands behind his back.

Q.     And after you got his hands behind his back, then what happened?  He was on the ground when he complied or he was still standing?

A.     He was on the ground.

Q.     Okay.  What happened after he was on the ground?

A.     We attempted to place handcuffs.

Q.     Okay.

A.     And he passively resisted.

Q.     Passively resisted.  Are the terms fighting stance and passively resisted terms that you have been taught in your training  - -

A.     Afer he was on the ground.

Q.     Listen to my question.  Are the terms passively resisted and taking a fighting stance terms that you have learned through your training about what constitutes resisting arrest?

A.     Some.

Q.     Okay.  And then he was taken into custody.  Correct?

A.      Yes.

Q.      And Mr. Lucas and Mr. Rossi, they were let go.  Correct?

A.      Yes.

(Doc. 21-2, Ex. A, NT 45-47).

During his deposition, Plaintiff testified as to his arrest as follows:

MR. FISHER:        That's when Officer Dickmyer grabbed my arm from behind.

Q.      Okay what happened then?

A.      It be easier for me to show you if I could; care if I stand up?

Q.      Why don't you just tell me and then . . .

ATTORNEY BAILEY:  Don't lay.  Don't lay hands on Frank.

MR. FISHER:  No no.

ATTORNEY LAVERY:        Why don't you just tell me and then if you wanna demonstrate that's, but tell me first, then you can demonstrate?

MR. FISHER:  Okay very good, when h grabbed my arm my reaction was to pull away.

ATTORNEY BAILEY:  Entmyer (sic) when Entmyer (sic) grabbed you.

MR. FISHER:  Dickmyer, when Officer Dickmyer . . .

ATTORNEY BAILEY:  Dickmyer, I'm sorry.

MR. FISHER:   . . grabbed my arm (TAPE 1 END)

ATTORNEY BAILEY:   Thank you Tom.

ATTORNEY LAVERY: Okay go ahead.  You said you were reacton (sic) was to pull away.

43

MR. FISHER:  You know, he came up from behind me, went to grab my arm and when he did I basically did a like a wrestling move.  It startled me.

Q.      Okay what arm did he grab?

A.       My left arm.

Q.      Okay and when you say you did like a wrestling move what do you mean by that?

A.      I basically did a spin to try to break away from him.

Q.      Okay what happens then?

A.      Not expecting that being blind sided from the back like that.

Q.      What happens then?

A.      Well basically it's a I get out and I'm at this time then I'm facing Dickmyer and Officer Matthews goes grabs me from the back.  I basically you know again, I'm reacting to being attacked from the back and at that point they both I guess Dickmyer, Officer Dickmyer got his mace out and they ordered me to the ground and they basically forced me to the ground and made me eat dirt.

Q.      Now when you say officer Matthews then after yo did the wrestling move as you described it with Officer Dickmyer, did Officer Matthews then grab you/ Is that what you're saying?

A.      Yes.

Q.      Okay and then did you pull away or spin away from him too?

A.      I don't think he ever had a firm grip on me.

Q.      Well but what did you?  What I'm trying to find out is what did you do physically?  Whether he actually got a firm grip or not is really not my question.  What did you do physically when he went to grab you?

A.      I'm gonna say my reaction was the same as it was when Dick, Officer Dickmyer grabbed me from behind.  It was, I was just you know, I was getting attacked by these two officers and when they got the mace out that's.

44

Q.     Did you spin away from Officer Matthews in the same manner that you spun away from Officer Dickmyer as you described?

A.     Yeah I'm gonna, I'm gonna say I didn't get a complete breakaway. You know at that point like I said the I believe the two of 'em actually backed away from me and that's when they pulled their mace out.

Q.     Oka what arm did Officer Mathews attempt to grab you by?

A.     My right arm.

Q.     Okay and at that point he was to your back because you had spun around is that . . .

A.     Correct.

Q.     . . . the way it worked?

A.     Correct.

Q.     Okay, all right now you said that the officers forced you to the ground. How did they do that?

A.     Well, when they had their mace on me and they said you're under arrest you know I just, I said okay fine.  And I relaxed and they basically I don't wanna use the word jump me and they were, they forced me to the ground.

Q.     Did they jump on your back?  What did?  I mean how did they - - . . .

A.     I don't wanna say they did.  They didn't jump on my.  They approached me and physically grabbed my arms.

Q.     That's what I'm trying to find out.

A.     One on, one on each side of me.

Q.     Okay.

A.     And forced me to the ground.

Q.     Okay.

A.	I ate dirt.

Q.	when you say you ate dirt what do you mean by that?

A.	I have a stone driveway.

Q.	Okay so, are you saying you're (sic) face came into contact with the stones?

A.	They put, they put me on the ground hard.

Q.	Okay were there any marks or bruises on your body from that?

A.	I had black and blue marks that showed up a couple days after that.

Q.	Where were those black and blue marks?

A.	My arms.

Q.	But on your face

A.	I had scratches and stuff on my face.  I didn't have a beard at the time. You know it wasn't nothing like it needed stitches or anything like that, but it was.

Q.	Well I just wanna  - - .  Did they actually force your face into a gravel driveway is what I'm . . .

A.	Yes.

Q.	. . . asking you?

A.	Yes.

Q.	Okay was there any injuries to your face as a result of that?

A.	It was abrasions, brush burn, whatever you wanna call it.

Q.	Was it bleeding?

A.	I don't wanna say it was, no no.

Q.	Where was the?  Where were the abrasions and brush burns?

A.      Where; they were on my face.

Q.      Where on you . . .

A.      On the cheek.

Q.      Cheek.

A.      High part of your cheek.

Q.      Okay left or right.

A.      It was the right side.  The only reason I know it was my right side cause I was laying there I was looking at the wall and that would've been to my left.

Q.      Okay so you had this, these abrasions and brush burns to the high right side of your cheek correct?

A.      Yes.

Q.      And you have black and blue marks on your arms is that what you're saying?

A.      And they like I said they didn't show up till a couple days later.

Q.      Which arm was that?

A.      Both arms.

Q.      Any photographs of any of those injuries?

A.      No.

Q.      Was there a photograph taken of you at booking that day?

A.      Yeah it's about as good of a shot as that.

Q.      Okay was that the sheriff's department that took that photograph?

A.      Yes.

Q.     Did you complain of any injuries that day?

A.     No.

Q.     Did you request any medical treatment?

A.     No.

Q.     Did you believe you needed any medical treatment?

A.     No.

Q.     Did you ever get any medical treatment?

A.     No.

(Doc. 21-2, Ex. C, NT 112-120).

43.  Defendant Officer Mathews did not remember Plaintiff calling him a "dirty cop."  (Doc.

20, Ex. G, NT 50).

Plaintiff testified that after he called Mathews a dirty cop:

A.     When I said to Officer Matthews I said to him, I said you know again,
I said what the fuck are you doing, he's the guy we need to talk to to get this
straightened out.  Told Mike Ward to go over and stand with his cops.  And that's
when I said to officer Matthews I said I always knew you were a dirty cop.

Q.     Okay.

A.     And that's when he stuck his finger in my face and says you're under arrest.

Q.     So you said to Officer Matthews that I always knew you were a dirty cop.

A.     Yep.

Q.     Okay and then Officer Matthews does what physically?  I know you said
he's told you you're under . . .

A.     Stuck his finger in my face and said you're under arrest.

48

Q.      Okay right after you said I always knew you were a dirty cop.

A.      Correct.

(Doc. 21-2, Ex. C, NT 108-109).

47.-48.   On August 17, 2007, Plaintiff was charged in a Criminal Complaint with false imprisonment and resisting arrest under 18 Pa. C.S. §2903 and § 5104, respectively.  (Doc. 20, Ex. H).  Defendant Officer Dickmyer signed the Affidavit of Probable Cause attached to the Criminal Complaint.  The acts Plaintiff was charged with as stated in the Criminal Complaint were:

> FALSE IMPRISONMENT      The Actor, Thomas Fisher, on or about, 08/17/07 at 1020 hrs, in the County of York, knowingly and unlawfully restrained another person, as to interfere substantially with liberty of said other person, in violation of Section 2903 of the Pennsylvania Crimes Code, Act of December 6, 1972, as amended, 18 Pa. C.S. § 2903.

> RESISTING ARREST   The Actor, Thomas Fisher, on or about, 08/17/07, in the County of York, with the intent of preventing one or more public servants, from effecting a lawful arrest or discharging a duty, created a substantial risk of bodily injury to one or more public servants or other persons, in violation of Section 5104 of the Pennsylvania Crimes Code, Act of December 6, 1972, as amended, 18 Pa. C.S. § 5104.

(*Id*.).

49.   Both criminal charges Defendant Dickmyer filed against Plaintiff were bound over to York County Court of Common Pleas by Magisterial District Judge Leppo on October 22, 2007, after Plaintiff 's preliminary hearing.  (Doc. 20, Ex. B, NT 60).

50.  On January 23, 2008, the York County District Attorney's Office nolle prossed the false imprisonment charge against Plaintiff.  (Doc. 20, Ex. I).

On  February 6, 2008, the resisting arrest charge against Plaintiff was ordered withdrawn by the York County Court.  (*Id.*, Ex. J).

Thus, it is undisputed that the misdemeanor criminal charges Defendant Officer Dickmyer filed against Plaintiff regarding the August 17, 2007 incident were *nolle prossed* and withdrawn after the preliminary hearing and prior to trial in the CCP.

## III. Motion for Summary Judgment Standard.

In *Allen v. Fletcher*, 2009 WL 1542767, *2 (M.D. Pa.), the Court outlined the applicable standard to apply when considering a summary judgment motion as follows:

> Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Id.* An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

> Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2D § 2727 (2d ed.1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

> All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse*

*Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson,* 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

"Material facts" are those which might affect the outcome of the suit. *Justofin v. Metropolitan Life Ins. Co.*, 372 F.3d 517, 521 (3d Cir. 2004).

## IV. Discussion.

As mentioned, Plaintiff has raised false arrest, malicious prosecution and excessive force claims against Defendants Officers Dickmyer and Matthews relating to the August 17, 2007 incident. These claims of Plaintiff are brought under the Fourth Amendment. Plaintiff also raised a First Amendment retaliation claim against Defendant Matthews. Plaintiff has filed his civil rights action pursuant to §1983.

In a § 1983 civil rights action, the Plaintiff must prove the following two essential elements: (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct complained of deprived the Plaintiff of rights, privileges or immunities secured by the law or the Constitution of the United States. *Parratt v. Taylor*, 451 U.S. 527 (1981); *Kost v. Kozakiewicz*, 1 F. 3d 176, 184 (3d Cir. 1993); *Beattie v. Dept. of Corrections SCI-Mahanoy*, 2009 WL 533051, *3 (M.D. Pa.). Further, Section 1983 is not a source of substantive rights. Rather, it

is a means to redress violations of federal law by state actors. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).[2] *See also Holocheck v. Luzerne County Head Start, Inc.*, 385 F. Supp. 2d 491, 498-499 (M. D. Pa. 2005); *Phillips v. Miller*, 2010 WL 771793, *2 (M.D. Pa.).

It is well established that personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior*. *See, e.g., Rizzo v. Goode*, 423 U.S. 362 (1976); *Hampton v. Holmesburg Prison Officials*, 1546 F.2d 1077, 1082 (3d Cir. 1976); *Parratt, supra*. It is also well settled in the Third Circuit that personal involvement of defendants in alleged constitutional deprivations is a requirement in a § 1983 case and that a complaint must allege such personal involvement. *Id.* Each named defendant must be shown, through the complaint's allegations, to have been personally involved in the events or occurrences upon which Plaintiff's claims are based. *Id.; Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).

*1. First Amendment Retaliation Claim*

Plaintiff alleges that after he called Defendant Matthews a "dirty cop," Matthews retaliated against him by sticking his (Matthews') finger in his face and telling Plaintiff he was under arrest despite the fact that he (Plaintiff) called police to report Rossi and Lucas were trespassing on his property. Defendants argue that the undisputed evidence shows that Officer Matthews did not remember Plaintiff calling him a "dirty cop," that Officer Matthews was not the officer who first arrived at the scene, and that Officer Matthews was not the officer who initiated Plaintiff's arrest. Plaintiff argues (Doc. 24, p. 9) that "Matthews claims no memory of Fisher calling him a 'dirty cop,'" and that "this is the stuff of material facts in dispute". The undisputed record shows that Officer

---

[2]There is no dispute that both Defendants, as police officers, are state agents.

Matthews did not remember Plaintiff calling him a "dirty cop." (Doc. 20, Ex. G, NT 50). Thus, Matthews testified that he does not remember Plaintiff calling him a "dirty cop." Plaintiff offers no evidence that Defendant Matthews actually heard his comment. Therefore, we find no material fact in dispute on this issue contrary to Plaintiff's assertion.                    In *Mincy v. Chmielewski*, 2007 WL 707344, *5-*6 (M.D. Pa.), the Court stated:

> Retaliation for expressive activities can infringe upon an individual's rights under the First Amendment. *See Allah v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir.2000). To prevail on a retaliation claim under 42 U.S.C. § 1983, plaintiff must demonstrate (1) that he was engaged in protected activity; (2) that he suffered an "adverse action" by government officials; and (3) that there is "a causal link between the exercise of his constitutional rights and the adverse action taken against him." *Rauser v. Horn*, 241 F.3d 330 (3d Cir.2001) (quoting *Allah*, 229 F.3d at 225).

> "As a threshold matter, a [plaintiff] in a retaliation case must prove that the conduct which led to the alleged retaliation was constitutionally protected." *Rauser*, 241 F.3d at 333; *see also, Jerry v. Williamson,* 2006 WL 3741840, 1 (3d Cir.2006).

In *O'Connell v. Sobina,* 2008 WL 144199, *11 (W.D. Pa.), the Court stated "merely alleging the fact of retaliation is insufficient."

The *O'Connell* Court also stated:

> If the plaintiff proves these three elements, the burden
> shifts to the state actor to prove that it would have taken the
> same action without the unconstitutional factors. *Mt. Healthy*,
> 429 U.S. at 287.

*Id.; see also Fortune v. Basemore*, 2008 WL 4525373, *4-*5 (W. D. Pa.)("It is well settled that retaliation for the exercise of a constitutionally protected right is itself a violation of rights secured by the Constitution."); *Sims v. Piazza,* 2009 WL 3147800, *24 (M.D. Pa.) citing *Rauser v. Horn,* 241 F.3d 333-34 (3d Cir.2001).

Thus, Plaintiff must show that the alleged retaliatory conduct by the state actor was related

to his engaging in constitutionally-protected conduct.

In *Alexander v. Forr*, 2006 WL 2796412 at *22 (M.D. Pa.), the Court stated:

> [I]n establishing the elements of a First Amendment claim of retaliation, a plaintiff must come forward with more than "general attacks" upon the defendant's motivations and must produce "affirmative evidence" of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive. *Crawford-El v. Britton,* 523 U.S. 574, 600, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (internal citations omitted).

Moreover, as the *Mincy* Court stated, to succeed on a First Amendment retaliation claim, a Plaintiff must show that the action by state officials was sufficiently "adverse," that is "they would be 'sufficient to deter a person of ordinary firmness from exercising his First Amendment rights.'" 2007 WL 707344,*6.

In *Taylor v. JFC Staffing Assoc.*, 690 F. Supp. 2d 357, 375-77 (M.D. Pa. 2009), the Court stated:

> In *Hartman v. Moore,* 547 U.S. 250, 258, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006), the Supreme Court held that, in a case in which the plaintiff is alleging a claim of First Amendment retaliation in the form of an arrest and prosecution, the plaintiff must also plead and prove the absence of probable cause supporting the prosecution. Plaintiff has neither pled nor proven the absence of probable cause. This alone is sufficient to defeat Taylor's claim[.]

In *Burke v. Twp. of Cheltenham*, 2010 WL 3928524, *10 (E.D. Pa. 10-5-2010), the Court quoted the Third Circuit and stated, "[t]he Supreme Court has clearly held that prosecution of a citizen in retaliation for 'nonprovocatively voicing his objection' to police conduct impermissibly punishes constitutionally protected speech." (Citations omitted).

Based on the evidence detailed above, we agree with Defendants that they are entitled to summary judgment with respect to Plaintiff's retaliation claim against Officer Matthews. Since the

evidence shows that Defendant Matthews does not remember Plaintiff call him a "dirty cop" and, since Defendant Dickmyer initiated Plaintiff's arrest and issued the Criminal Complaint against Plaintiff, Plaintiff cannot succeed on his First Amendment retaliation claim because Matthews did not take any adverse action against him due to the unheard comment. Also, the evidence shows that there is no causal link between Plaintiff's exercise of his free speech right and any adverse action taken against him by Defendant Matthews since Matthews did not even remember hearing Plaintiff's comment and did not initiate Plaintiff's arrest.

Further, as we discuss below, we find that Defendants had probable cause to file the two charges against Plaintiff. This fact also defeats Plaintiff's First Amendment claim. See *Taylor v. JFC Staffing Assoc.*, 690 F. Supp. 2d at 375-77.

Thus, we will recommend that the Court grant Defendants' Summary Judgement Motion with respect to Plaintiff's First Amendment retaliation claim.

*2. Fourth Amendment Excessive Force Claim*

Plaintiff asserts a Fourth Amendment Excessive Force Claim against both Defendants as a result of the physical force used by Defendants during his August 17, 2007 arrest on his property.

The parties agree on the standard governing excessive force claims in the course of an arrest, investigatory stop or other type of seizure as specified by the United States Supreme Court in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865 (1989). The parties agree that, pursuant to *Graham*, excessive force claims are analyzed under the Fourth Amendment's objective reasonableness standard. *Id*. We concur with the Plaintiff that his claim alleging excessive force

was utilized during his arrest for the charges of false imprisonment and resisting arrest falls under the Fourth Amendment, which protects against unreasonable seizures. Thus, Plaintiff's excessive force claim must be considered under the Fourth Amendment's reasonableness standard.[3]

"A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable. *Curley v. Klem*, 298 F.3d 271, 279 (3d Cir. 2002); *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004). A seizure of the plaintiff occurs "[w]henever an officer restrains the freedom of [the plaintiff] to walk away." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694 (1985). "The use of excessive force is itself an unlawful seizure under the Fourth Amendment." *McNeil v. City of Easton*, 694 F. Supp. 2d at 392.

In the present case, as discussed above, the evidence shows that a seizure of the Plaintiff occurred on August 17, 2007, as he was handcuffed by Defendants and taken into custody. Thus, the issue in our case is whether the seizure of the Plaintiff by Defendants was objectively reasonable. *See McNeil v. City of Easton*, 694 F. Supp. 2d at 392.

The Third Circuit in *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004)[4], stated:

> An excessive force claim must be evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and "must embody the allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are often tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97, 109 S.Ct. 1865.

---

[3]The Defendants also concur that the excessive force claim at issue in this case should be analyzed under the Fourth Amendment and its reasonableness standard as annunciated in *Graham*. (Doc. 18, pp. 15-16).

[4]*Rivas* is also found at 2004 WL 877645.

> The inquiry turns on "objective reasonableness," meaning that the standard is whether the police officer's "actions [were] 'objectively reasonable' in light of the facts and circumstances" facing the officer, regardless of the officer's intent or motivation. *Id.* at 397, 109 S.Ct. 1865.

In the context of a §1983 claim, as we are presented with in this case, there is a three-part test to be applied in determining the reasonableness of the force which was used. The following factors are to be considered:

1. "the severity of the crime at issue;"

2. "whether the suspect poses an immediate threat to the safety of the officers or others;" and

3. "whether [the arrestee] is actively resisting arrest or attempting to evade arrest by flight. "

*Graham,* 490 U.S. at 396, 109 S.Ct. at 1867; *McNeil v. City of Easton*, 694 F. Supp. 2d at 392.

The *Rivas* Court stated that:

> Additional factors include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997). The reasonableness of the use of force is normally an issue for the jury. *See Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999). While some courts "freeze the time frame" and consider only the facts and circumstances at the precise moment that excessive force is applied, other courts, including this one, have considered all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force. *See, e.g., Abraham*, 183 F.3d at 291.

*Rivas*, 365 F.3d at 198; *McNeil v. City of Easton*, 694 F. Supp. 2d at 392.

Careful attention to the facts and circumstances of each particular case must be given, including the aforementioned three factors. *Graham,* 490 U.S. at 396; *McNeil v. City of Easton*, 694 F. Supp. 2d at 392.

Based on the above quoted record, we do not find any factual disputes in this case concerning the Plaintiff's behavior prior to and during the arrest at issue as well as the amount of resistance he was presenting. The offenses with which the Plaintiff was charged were two second degree misdemeanor offenses. 18 Pa. C.S.A. §2903 and §5104. The facts are not disputed as to if the Plaintiff posed an immediate threat to the safety of Officers Dickmyer and Matthews. Plaintiff was agitated, using obscenities and confrontational. Also, a rifle (regardless of its caliber) was close to Plaintiff. Defendants stated Plaintiff dangled the keys in front of them and put them back in his pocket. The record is not disputed that both Defendant officers had to remove their pepper spray from their belts to get Plaintiff to follow their orders but that they did not use the spray. Plaintiff admits that he resisted when the officers tried to handcuff him. Also, Plaintiff only received very minor injuries and did not ask for or require any medical care after his arrest.

Thus, reasonable officers at the scene clearly would have found that Plaintiff posed an immediate threat to their safety. See *McNeill v. City of Easton*, 694 F. Supp. 2d at 392-393. Also, as stated, Plaintiff resisted being handcuffed. Defendants eventually were able to place Plaintiff on the ground and handcuff his hands behind his back.

In *McNeill v. City of Easton*, 694 F. Supp. 2d at 393, the Court stated:

> The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872, 104 L.Ed.2d at 455; *accord*

> *Mierzwa v. United States,* 282 Fed.Appx. 973, 979 (3d Cir.2008).
> Even if a plaintiff is not armed, it is reasonable for law enforcement officers to
> employ multiple rounds of non-lethal force if necessary to effectuate an arrest.
> *Wargo v. Municipality of Monroeville,* 646 F.Supp.2d 777, 786 (W.D.Pa.2009).
> The United States Court of Appeals for the Third Circuit has found the use of
> non-lethal force to be reasonable to arrest a suspect who is resisting arrest.
>
> In *Brown v. Rinehart,* 325 Fed.Appx. at 49, 51, the defendant officers
> used reasonable force when they sprayed pepper spray on the plaintiff and
> delivered "stun blows" to plaintiff's head and knee to overcome his resistance.
> In *Mierzwa,* 282 Fed.Appx. at 979, the Third Circuit held that it was reasonable
> for the officers to physically restrain plaintiff and to administer pepper spray in
> order to effectuate an arrest.

Based on the record quoted above, we agree with Defendants that the force they were required to use on Plaintiff to effectuate his arrest on August 17, 2007, under the facts and circumstances, did not constitute excessive force. Plaintiff's own actions caused Defendants to use the force which is fully detailed above.

Therefore, we will recommend that the Court grant Defendants' Summary Judgment Motion with respect to Plaintiff's Fourth Amendment excessive force claim.

3. *Fourth Amendment False Arrest and Malicious Prosecution Claims*

Plaintiff raises Fourth Amendment false arrest and malicious prosecution claims against both Defendants. Defendant Dickmyer filed a Criminal Complaint and an Affidavit of Probable Cause against Plaintiff on August 17, 2007, charging him with false imprisonment and resisting arrest. In his Affidavit of Probable Cause, Defendant Dickmyer stated as follows:

> On August 17th, 2007 at 1020 hrs Thomas Fisher reported two sub-contracted
> Adams Electric employees were on his property at 1482 Hoke Rd. in North
> Codorus Twp. and he wasn't letting them leave.
>
> I made contact with Fisher and he stated he took their company car keys
> because they were driving on the gravel lane on his property.

Employees William Lucas and Eugene Rossi, reported that they come on the property to check the growth of the trees by the power lines. Employees stated they were acting on behalf of Adams Electric. Employees stated they were then stopped by Fisher who was standing in the middle of the lane. They then stated Fisher grabbed the car keys out of their ignition and was yelling profanities at them. Employees stated Fisher then walked back over to his garage and they were unable to leave the property. Employees stated they were in fear for their safety. I attempted to have both parties talk the incident over and Fisher continued to yell at the employees. Fisher had their car keys in his shirt pocket. Employees were unable to have access to their keys for about two hours.

Myself and Ofc. Matthews made contact with Fisher to attempt to get the keys back. Fisher was acting combative and yelling profanities. I then attempted to place Fisher under arrest. I then told Fisher he was under arrest and he resisted me. Fisher was then taken to the ground by force and handcuffed.

(Doc. 20, Ex. H).

Both criminal charges Defendant Dickmyer filed against Plaintiff were bound over to York County Court of Common Pleas by Magisterial District Judge Leppo on October 22, 2007, after Plaintiff's preliminary hearing. (Doc. 20, Ex. B, NT 60).

On January 23, 2008, the York County District Attorney's Office *nolle prossed* the false imprisonment charge against Plaintiff. (Doc. 20, Ex. I).

On February 6, 2008, the resisting arrest charge against Plaintiff was ordered withdrawn by the York County Court. (*Id.*, Ex. J).

Thus, neither charge Defendant Dickmyer filed against Plaintiff ever proceeded to trial before the York County Court.

Initially, probable cause to support an arrest does not "require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). Thus, simply because the charges Defendant Dickmyer filed

against Plaintiff were *nolle prossed* and withdrawn when Plaintiff's case was before the County Court, does not necessarily show that Defendants lacked probable cause to arrest Plaintiff and that Defendant Dickmyer lacked probable cause to issue the Criminal Complaint against Plaintiff.

As the parties recognize, the lack of probable cause is a required element of Plaintiff's Fourth Amendment false arrest and malicious prosecution claims. *McNeill v. City of Easton*, 694 F. Supp. 2d at 390. Thus, if Defendants had probable cause to arrest Plaintiff on August 17, 2007, Plaintiff's false arrest and malicious prosecution claims must fail. *Id.*

Defendants argue that they are entitled to summary judgment with respect to Plaintiff's false arrest and malicious prosecution claims against them, and that Plaintiff's arrest without a warrant was reasonable under the Fourth Amendment since there was probable cause on August 17, 2007, to believe that Plaintiff was committing criminal offenses. Defendants state that "based upon the undisputed material facts of record, [they] had probable cause to arrest Plaintiff for false imprisonment and resisting arrest." (Doc. 18, p. 11).

A false imprisonment offense under 18 Pa. C.S.A. §2903, occurs when:

"A person commits an offense if he knowingly restrains another unlawfully so as to interfere substantially with his liberty." Thus, the elements of a false imprisonment offense are the detention of another person and the unlawfulness of such detention.

A resisting arrest offense under 18 Pa. C.S.A. §5104, occurs when:

"A person commits a misdemeanor of the second degree if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring

61

substantial force to overcome the resistance."

To succeed on a false arrest claim under § 1983, the Court in *Kokinda v. Breiner,* 557 F.

Supp. 2d 581, 592 (2008 M.D. Pa.), stated:

> A claim under § 1983 for false arrest/false imprisonment is grounded in
> the Fourth Amendment guarantee against unreasonable seizures. *Garcia v. County
> of Bucks,* 155 F.Supp.2d 259, 265 (E.D.Pa.2001) (citing *Groman v. Twp. of Manalapan,*
> 47 F.3d 628, 636 (3d Cir.1995)). To maintain his false arrest claims, "a plaintiff
> must show that the arresting officer lacked probable cause to make the arrest." *Id.*
> "Probable cause exists when the totality of facts and circumstances are sufficient to
> warrant an ordinary prudent officer to believe that the party charged has
> committed an offense." *Id.*

> "[W]here the police lack probable cause to make an arrest, the arrestee has
> a claim under § 1983 for false imprisonment based on a detention pursuant to that
> arrest." *Groman v. Twp. of Manalapan,* 47 F.3d 628, 636 (3d Cir.1995). However,
> unlike a malicious prosecution claim, for which each criminal charge
> is analyzed independently, a false arrest claim will fail if there was probable cause
> to arrest for at least one of the offenses involved. *Johnson,* 477 F.3d at 75; *see
> also Barna v. City of Perth Amboy,* 42 F.3d 809, 819 (3d Cir.1994) (holding that for
> an arrest to be justified, "[p]robable cause need only exist as to any offense that
> could be charged under the circumstances").

*See also Cummings v. City of Phila.,* 137 Fed. Appx. 504, 506 (3d Cir. 2005); *Basile v. Twp. of Smith,*

2010 WL 4687787, *4 (W.D. Pa. 11-10-10).

In *Irick v. City of Phila.,* 2008 WL 2120171, *8 (E. D. Pa.), the Court stated:

> An arrest may violate the standards of the Fourth Amendment if it is
> made without probable cause to believe that a crime has been committed.
> *Barna v. City of Perth Amboy,* 42 F.3d 809, 819 (3d Cir.1994). Thus,
> the proper inquiry in a Section 1983 claim based on false arrest is
> "'whether the arresting officers had probable cause to believe the person
> arrested had committed the offense.' " *Groman v. Township of Manalapan,*
> 47 F.3d 628, 634 (3d Cir.1995). If the arresting officer lacked probable cause
> to make the arrest, the arrestee also has a claim under § 1983 for false
> imprisonment based on a detention pursuant to that arrest." *Id.* at 636
> (*citing Thomas v. Kippermann,* 846 F.2d 1009, 1011 (5th Cir.1988)).

Typically, the existence of probable cause in a § 1983 action is a question of fact. *Wilson v. Russo,* 212 F.3d 781, 796 (3d Cir.2000) (*citing Sherwood v. Mulvihill,* 113 F.3d 396, 401 (3d Cir.1997)); *Groman,* 47 F.3d at 635. A court, however, can conclude that probable cause did not exist as a matter of law if the evidence viewed in the light most favorable to the non-moving party would not reasonably support a finding of probable cause. *See Sherwood,* 113 F.3d at 401. It is the Court's role to determine whether the objective facts available to the police officer at the time of the arrest would justify a reasonable belief that an offense was being committed. *Victory Outreach Ctr. v. Melso,* 313 F.Supp.2d 481, 488 (E.D.Pa.2004) (*citing Johnson v. Campbell,* 332 F.3d 199, 211 (3d Cir.2003)). Thus, the Court must examine whether any facts in the record reasonably support a finding of a lack of probable cause.

"Probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 788 (3d Cir.2000) (*citing Orsatti v. New Jersey State Police,* 71 F.3d 480, 482 (3d Cir.1995). [FN2]. Thus, the probable cause standard does not turn on the actual guilt or innocence of the arrestee, but rather, whether the arresting officer reasonably believed that the arrestee had committed the crime." *Radich v. Goode,* 886 F.2d 1391, 1397 (3d Cir.1989); *see also Barna,* 42 F.3d at 819 ("The test for an arrest without probable cause is an objective one, based on the facts available to the officers at the moment of arrest."). The good faith or bad faith of the arresting officer is entirely irrelevant. *Whren v. United States,* 517 U.S. 529, 531 (1998).

> FN2. "The validity of an arrest is determined by the law of the state where the arrest occurred." *United States v. Myers,* 308 F.3d 251, 255).

In *Reedy v. Evanson*, 615 F. 3d 197, 211 (3d Cir. 2010), the Third Circuit stated that "[i]t is well-established that the Fourth Amendment 'prohibits a police officer from arresting a citizen except upon probable cause.'" (citations omitted). The *Reedy* Court also stated:

> Probable cause "requires more than mere suspicion [.]" *Orsatti,* 71 F.3d at 482. However, it does not "require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams,* 407 U.S. 143, 149, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

Rather, "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti*, 71 F.3d at 483; *see also Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir.2000) ("Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." (citation omitted).). "Probable cause need only exist as to [one of the] offense[s] that could be charged under the circumstances." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir.1994). In analyzing whether probable cause existed for an arrest, we must take a "totality-of-the-circumstances approach." *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

In *Burke v. Twp. of Cheltenham*, 2010 WL 3928524, *10 (E.D. Pa. 10-5-2010), the Court stated the elements of a §1983 malicious prosecution claim:

"[t]o prove malicious prosecution under section 1983 when the claim is under the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in his favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Johnson v. Knorr*, 477 F.3d 75, 81-82 (3d Cir.2007).

Defendants argue that they had probable cause to arrest Plaintiff for false imprisonment and resisting arrest. Lucas and Rossi worked for PennLine tree service, had a PennLIne sign on their truck, and went to look at trees to trim for a bid for Adams Co-op electric company. Rossi and Lucas drove on an easement on Plaintiff's property to look at the trees and, they went beyond the easement and onto Plaintiff's property. Rossi and Lucas did not inform Plaintiff prior to their arrival that they would be going on the easement for a bid that day. It is not disputed that Lucas and Rossi stated that Plaintiff jumped in front of their vehicle, cursed at them and removed the keys from their vehicle. After Plaintiff took the keys to the truck Lucas and Rossi occupied, they stated they would not leave the property without the truck, which was a new vehicle. Rossi and Lucas stated that they

could have walked off of the property without the truck.  Rossi and Lucas remained sitting in the truck after Plaintiff took the keys until the police arrived.

When Defendant Dickmyer arrived, he spoke with Plaintiff, who was visibly upset and yelling.  Defendant Dickmyer noticed a rifle near where Plaintiff was standing.  Defendant Dickmyer then spoke to Rossi and Lucas who were sitting in their truck.  Rossi and Lucas appeared nervous and upset to Defendant Dickmyer.  Rossi and Lucas told Defendant Dickmyer they were at the area to bid on tree trimming for Adams Electric.  Defendant Dickmyer's intent was to resolve the situation.  He did not intend to arrest anyone.  Defendant Dickmyer called for back up to Defendant Matthews to assist in gaining control of the situation.

Defendants testified that they were trying to get the keys back from Plaintiff, Plaintiff was pacing around his garage.  Defendants stated that Plaintiff took the keys out of his pocket, dangled them and put them back in his pocket.   Defendants stated that Plaintiff refused to hand over the keys and became agitated when they indicated they would not charge Rossi and Lucas with trespassing.   Defendants stated that Plaintiff began yelling profanities, and then Defendant Dickmyer advised Plaintiff he was under arrest and he tried to grab Plaintiff's arm to gain control. Defendant Matthews also tried to gain control and, Plaintiff tensed up and pushed both Defendants away.  Plaintiff then spun to break away from Defendant Dickmyer.  According to Defendants, Plaintiff stood in a fighting stance with fists clenched facing them.  Defendants then took out their pepper spray, but did not use it at any time.  Defendants ordered Plaintiff to the ground, and Dickmyer grabbed Plaintiff's arm to gain control and placed Plaintiff on the ground.    Both Defendants then handcuffed Plaintiff behind his back. Defendant Matthews removed the keys from

Plaintiff's pocket. Plaintiff received only minor abrasions and did not require or request any medical care. There is no dispute that Defendants took Plaintiff into custody and that he was deprived on his liberty as a result of the August 17, 2007 arrest.

On August 17, 2007, Defendant Dickmyer filed a Criminal Complaint against Plaintiff charging him with false imprisonment and resisting arrest, and he attached an Affidavit of Probable Cause. The charges against Plaintiff were bound over to County Court after a preliminary hearing. Subsequently, both charges against were either *nolle prossed* or withdrawn prior to trial in County Court.

Plaintiff has asserted a false arrest claim and a malicious prosecution claim against Defendants Dickmyer and Matthews. As discussed above, Defendant Dickmyer's Affidavit of Probable Cause was clearly consistent with his testimony and Defendant Officer Matthews' testimony regarding the August 17, 2007 incident with Plaintiff. Plaintiff admitted that it was his intent not to let the truck of Rossi and Lucas leave his property. Plaintiff took the law into his own hands, even if Rossi and Lucas went beyond the easement and were on his property, when he took the keys to their truck and refused to return then even to the Defendant Officers.

It is undisputed that Defendants arrested Plaintiff without a warrant on August 17, 2007, and that they took Plaintiff into custody. Defendant Dickmyer filed criminal charges against Plaintiff on that day. With respect to Plaintiff's false arrest claim and malicious prosecution claim against Defendants, we agree with Defendants and find that, based on Defendants' testimony regarding the August 17, 2007 incident with Plaintiff, and based on the undisputed evidence, Defendants had probable cause to believe Plaintiff had committed the offenses of false imprisonment and resisting

arrest.  Plaintiff's conduct after Defendant Dickmyer advised Plaintiff he was under arrest clearly was sufficient under the facts and circumstances within Defendants' personal knowledge to warrant a reasonable person to believe that Plaintiff was resisting arrest and that he knowingly restrained the liberty of Rossi and Lucas to leave the area after he took the keys to their truck.

In *Basile v. Twp. of Smith*, 2010 WL 4687787, *5, the Court stated:

> In determining whether probable cause existed for an arrest, the court applies an objective standard based on " 'the facts available to the officers at the moment of arrest.' " *Barna,* 42 F.3d at 819 (quoting *Beck v. Ohio,* 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Edwards v. City of Philadelphia,* 860 F.2d 568, 571 n. 2 (3d Cir.1988)). Moreover, "[e]vidence that may prove insufficient to establish guilt at trial may still be sufficient to find the arrest occurred within the bounds of the law." *Id.* (citing *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959)). Finally, "[p]robable cause need only exist as to any offense that could be charged under the circumstances." *Id.* (citing *Edwards,* 860 F.2d at 575-76); *Johnson v. Knorr,* 477 F.3d 75, 84-85 (3d Cir.2007) (citing *Barna* and *Edwards, supra*; also citing *Wright v. City of Philadelphia,* 409 F.3d 595, 602-04 (3d Cir.2005)).

We find that the evidence reasonably would not support a contrary factual finding that Defendants had probable cause to arrest Plaintiff on August 17, 2007, on both stated offenses.

We find that the evidence is undisputed that the objective facts available to Defendants at the time of their August 17, 2007 arrest of Plaintiff justified a reasonable belief that the stated criminal offenses were being committed by Plaintiff.  Further, we find the facts in the record are undisputed that Defendants' personal observations would reasonably support a finding that they had probable cause to arrest Plaintiff.  Moreover, as discussed, the Magisterial District Judge found that Defendants had established a *prima facie* case against Plaintiff at the preliminary hearing and bound over both charges against Plaintiff to the York County Court for trial.

As Defendants point out, since the charges against Plaintiff were bound over for court and

trial, after a preliminary hearing before a Pennsylvania magisterial district judge, despite the subsequent dismissal and withdrawal of the charges, there was some initial independent judicial finding that probable cause existed with respect to Defendants' arrest of Plaintiff on the charges and with respect to the Criminal Complaint Defendant Dickmyer filed against Plaintiff. "The purpose of a preliminary hearing [in Pennsylvania] is to avoid the incarceration or trial of a Defendant unless there is sufficient evidence to establish a crime was committed and the probability the Defendant could be connected with the crime." *Com. v. Tyler*, 587 A.2d 326 (Pa. Super. 1991).

The independent judicial determination, of which there is no dispute, found that there was a sufficient showing by Defendants of a *prima facie* case against Plaintiff with respect to both charges, and that there was a factual and legal basis for Plaintiff's arrest as a result of the August 17, 2007 incident since the charges were bound over to court for trial. A *prima facie* case is when the evidence read in a light most favorable to the Commonwealth, "sufficiently established both the commission of a crime and that the accused is probably the perpetrator of that crime." *Com. v. Hendricks*, –A. 2d —, 2007 WL 1732578 (Pa. Super. 2007). As discussed, we find that the record shows that Defendants had sufficient probable cause that Plaintiff committed the stated two offenses, and the magisterial district judge found that there was sufficient evidence to allow the charges to go to the jury.

As the Court in *Kokinda*, 557 F. Supp. 2d at 593, stated, based on *Virginia v. Moore*, ___U.S.___, 128 S. Ct. 1598, 1607-08 (2008), "[w]hen officers have probable cause to believe that a person has committed a crime in their presence, the Fourth Amendment permits them to make an arrest."

68

We find that Defendants' evidence is enough to show that no material facts are in dispute as to whether Defendants had facts and circumstances within in their knowledge on August 17, 2007, to warrant a reasonable person to believe that Plaintiff committed the stated offenses. We agree with Defendants (Doc. 18, p. 13) that it is not important with respect to Plaintiff's Fourth Amendment false arrest claim and malicious prosecution claim that the charges were later dismissed. As the *Irick* Court stated, in quoting the Third Circuit Court of Appeals, "the probable cause standard does not turn on the actual guilt or innocence of the arrestee, but rather, whether the arresting officer reasonably believed that the arrestee had committed the crime." 2008 WL 2120171, *8 (citations omitted). Therefore, we agree with Defendants that the facts in the record, detailed above, reasonably support a finding that Defendants had probable cause to arrest Plaintiff and that Defendants had a reasonable belief that Plaintiff committed the stated two crimes on August 17, 2007. We also agree with Defendants that there is no evidence in the record which shows that Defendants (Doc. 24, p. 9) filed the charges against Plaintiff with a malicious motive which is a requisite element of Plaintiff's malicious prosecution claim.

Thus, we will recommend that the Court grant Defendants' Summary Judgment Motion with respect to Plaintiff's false arrest claim and malicious prosecution claim against Defendants Dickmyer and Matthews.

## V. Recommendation.

Based on the foregoing, it is respectfully recommended that the Court grant Defendants' Summary Judgment Motion **(Doc. 17)** with respect to all of Plaintiff's constitutional claims under §1983 against Defendant Dickmyer and Defendant Matthews.   It is recommended that the Court enter Judgment in favor of both Defendants and against Plaintiff with respect to all of Plaintiff's claims.

<u>s/Thomas M. Blewitt</u>
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: March 15, 2011**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THOMAS M. FISHER,                    :      CIVIL ACTION NO. **1:CV-09-1572**
                                     :
                  Plaintiff          :      (Judge Jones)
                                     :
        v.                           :      (Magistrate Judge Blewitt)
                                     :
MICHAEL MATTHEWS and                 :
SHAUN DICKMYER,                      :
                                     :
                                     :
                  Defendants         :

## NOTICE

**NOTICE IS HEREBY GIVEN** that the undersigned has entered the foregoing

**Report and Recommendation** dated **March 15, 2011.**

Any party may obtain a review of the Report and Recommendation pursuant to

Rule 72.3, which provides:

Any party may object to a magistrate judge's proposed findings,
recommendations or report addressing a motion or matter described in
28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the
disposition of a prisoner case or a habeas corpus petition within fourteen (14)
days after being served with a copy thereof.  Such party shall file
with the clerk of court, and serve on the magistrate judge and all
parties, written objections which shall specifically identify the
portions of the proposed findings, recommendations or report to which
objection is made and the basis for such objections.  The briefing
requirements set forth in Local Rule 72.2 shall apply.  A judge shall
make a *de novo* determination of those portions of the report or
specified proposed findings or recommendations to which objection
is made and may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge.  The judge, however,
need conduct a new hearing only in his or her discretion or where
required by law, and may consider the record developed before the

magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.


                                      **s/ Thomas M. Blewitt**
_____                            
                                       **THOMAS M. BLEWITT**
                                       **United States Magistrate Judge**


**Dated: March 15, 2011**